| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 25 CR 321-3 |
| | ) | Hon. Sharon Johnson Coleman |
| ANOSH AHMED, *et al.* | ) | |
| (MAHMOOD SAMI KHAN), | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS KHAN'S MEMORANDUM
<u>IN SUPPORT OF HIS PRETRIAL MOTIONS</u>**

Defendant, **MAHMOOD SAMI KHAN**, by and through his attorneys, respectfully submits the following memorandum in support of his motions: (1) to sever codefendants Ahmed and Sirajudeen and preclude evidence related only to them; (2) to dismiss Count 19 as duplicitous or to preclude evidence; and, (3) for a bill of particulars related to Count 19.

## I.       Introduction

The Indictment in this case is lengthy (48 pages) and wide-ranging encompassing multiple types of charges - wire fraud, anti-kickback violations, wrongful obtaining of healthcare information, and money laundering. There are four charged defendants, six other individuals alleged to be involved in various offenses, a hospital in Chicago, a laboratory in Chicago, six laboratories in Texas, and various companies affiliated with the first two listed defendants Anosh Ahmed and Mohamed Sirajudeen.

As the Indictment itself makes clear, Defendant Mahmood Sami Khan ("Sami") had no involvement with the Chicago hospital, no involvement with the Chicago laboratory, no involvement in anti-kickback violations, and no involvement in the wrongful obtaining of health

information. Most significantly, as discussed below, the fraud scheme begins with the lab in Chicago, O'Hare Clinical Labs ("OCL"), but the allegations regarding OCL do not even mention Sami. As charged, and factually, Sami had nothing to do with fraud at OCL. While Sami is charged in four of the fourteen wire fraud counts (Counts 7, 8, 11 & 13), the wirings for those counts do not relate to OCL or the OCL scheme. The Indictment alleges that OCL was disqualified from billing HRSA in September of 2021, and all of the wirings charging Sami come after that date.

There are other aspects of the Indictment which also have nothing to do with Sami: the anti-kickback violations charged in Counts 15 through 17 and the wrongful obtaining of healthcare information charged in Count 18. Sami is not charged in any of those Counts, nor is he alleged to be an uncharged participant or to have knowledge of any of those offenses.[1] Nevertheless, the money laundering conspiracy Count (Count 19) in which Sami is charged, alleges anti-kickback violations as one of the two specified unlawful activities, along with wire fraud, generating the proceeds that were laundered. Because one of those sources of proceeds, anti-kickback violations, has nothing to do with Sami, and there is no allegation that Sami had knowledge of that unlawful activity, the charged conspiracy to launder proceeds is, in reality, two conspiracies.

On top of all of this, the defndants who received essentially all of the proceeds of the crimes alleged, will almost certainly not be defendants at the upcoming trial. The lead defendant, Anosh Ahmed, who is alleged to have been involved in every allegation in the Indictment and is charged in every Count except one (Count 23) is a fugitive. The second defendant, Mohamed Sirajudeen, is alleged to have been involved in the wire fraud scheme, the anti-kickback violations, and money laundering but is charged in only Count 23 (a substantive money laundering charge). He is likely to be a government witness at the upcoming trial.

---

[1] Counsel for codefendant Chaudhry, who is also not charged in Counts 15 through 18, has moved to sever those Counts. We have filed a motion for leave to adopt that motion and other filed by Chaudhry.

In light of these circumstances, the challenge for counsel is how to make sure that the charges against Ahmed and Sirajudeen are properly separated from the charges against Sami, and that evidence not relevant to Sami is properly excluded. To that end, the defense moves: (1) to sever Defendants Ahmed and Sirajudeen and preclude evidence related solely to them (the Hospital A and OCL aspects of the fraud scheme along with the anti-kickback and wrongful disclosure charges); (2) to dismiss Count 19 as duplicitous or to preclude from that Count evidence related to OCL and anti-kickback violations ; and, (3) for a bill of particulars related to Count 19.

Not only are these motions appropriate in light of the Indictment's allegations and the reality that Ahmed and Sirajudeen are charged with offenses entirely separate from Sami, but granting the defense motions will also result in a significant streamlining and shortening of the trial. Evidence related to Hospital A, the alleged fraud at OCL, and the alleged anti-kickback violations would likely take weeks to present; and, particularly with regard to the anti-kickback scheme, would require needlessly complicated defenses and jury instructions. A trial of the allegations related to Sami only (along with codefendant Chaudhry) would be significantly shorter, straightforward, and would avoid, as best as is possible in a federal criminal trial, needlessly complicated jury instructions.

## II.     The Charges in the Indictment

### Counts One through Fourteen (wire fraud scheme)

Counts One through Fourteen charge a wire fraud scheme which, in summary, alleges a scheme to defraud HRSA by submitting false claims for "Covid-19 testing of specimens purportedly collected from uninsured individuals, knowing that such testing had not occurred." (Docket 1, pg. 11, par. 3) The Indictment alleges that the scheme was operated through a variety of laboratories owned or operated by the defendants or other individuals. *Id*. Although all four

defendants, along with six other unnamed individuals (Individuals A-F), are described as having been involved in the scheme, only Ahmed and Sami are charged in Counts One through Fourteen. *Id*. at pp. 7-11. Ahmed is charged in all of Counts One through Fourteen, and Sami is charged with Ahmed in Counts Seven, Eight, Eleven, and Thirteen.

The scheme begins with the obtaining of patient data, first from Hospital A (a hospital in Chicago) by Ahmed along with Individual F. No other defendant or individual is alleged to have participated in the patient data collection from Hospital A. *Id*. at p. 12, par. 4. Other means of obtaining patient data are alleged to have been performed by Ahmed, Sami and Chaudhry including from an internet site run by Khan, from people who were given free home tests, and from people who were looking to receive information about Covid-19. *Id*. at p. 12, pars. 4-6.

The first laboratory alleged to have been involved is OCL. *Id*. at pp. 13-17. OCL's involvement in fraudulent billing starts in June of 2021 and ends in September of 2021, when OCL was disqualified from submitting claims to HRSA. *Id*. at p. 13, par. 7; p. 17. Par. 20. The OCL allegations are complex and somewhat convoluted. For example, although Defendant Sirajudeen (the operator of OCL) is alleged to have been a participant (but not a defendant) in the fraud scheme charged in Counts One through Fourteen, the Indictment indicates that Defendant Ahmed falsely represented a variety of facts to OCL and others to convince Sirajudeen to pay higher collection fees to Ahmed.[2] *Id*. at p. 11, par. 2; p. 13, par. 7. The Indictment alleges that Ahmed falsely told Sirajudeen that Ahmed was still working for Hospital A, that Hospital A was collecting samples for Covid testing at multiple sites in Chicago and from other collection sites in Illinois, Florida, Louisiana, Missouri, and Texas, and that Hospital A was providing test results to patients. *Id*. at p.

---

[2] The false facts asserted by Ahmed are essentially that he was still working for Hospital A, that Hospital A was collecting samples for Covid testing at multiple sites in Chicago and from other collection sites in Illinois, Florida, Louisiana, Missouri, and Texas, and that Hospital A was providing test results to patients. *Id*. at p. 13, par. 7; p. 16, par. 16e; p. 14, par. 10.

13, par. 7; p. 16, par. 16e; p. 14, par. 10. Ahmed also caused patient name and information to be "scrambled" before being submitted to OCL. *Id*. at p. 13, par. 12. Nevertheless, and despite these misleading statements from Ahmed, the Indictment alleges that Sirajudeen knowingly submitted false billing to HRSA - "Sirajudeen caused OCL to submit claims to HRSA from the patient lists AHMED submitted and caused to be submitted instead of the laboratory testing data, knowing that OCL had not performed testing associated with those patient lists." *Id*. at pp. 16-17, par. 17.

The OCL section of Counts One through Fourteen does not allege any participation by Sami whatsoever. *Id*. at pp. 13-17. Nor, does the OCL section allege awareness of that aspect of the scheme by Sami.[3]

Starting t*wo months after* OCL was disqualified by HRSA, in November 2021, the Indictment alleges that the "Ahmed's Non-Operational Texas Laboratories" aspect of the scheme began. *Id*. at p. 17. Par. 21. These Texas labs are listed as Summer Diagnostic Labs, Apollo Labs, Softland Labs, Artemis Labs and Helios Labs. *Id*. Although the level of involvement varies, the Indictment alleges that Sami has some connection with five of the six Texas labs. *Id*. at pp. 17-21. The Indictment alleges involvement only by Ahmed and Chaudhry with Softland Labs. In summary, the Texas labs are alleged to have been used to submit fraudulent billing for Covid testing which those labs "could not and did not run." *Id*. at p. 24, par. 31.

The next aspect of the scheme involves Lab A, a working lab in Texas. *Id* at pp. 24-25, pars. 32-37. The allegations regarding Lab A are that the true purchaser of the lab was being hidden from the owner, Individual D. First Sirajudeen was to be the purchaser (he began paying expenses

---

[3] When the Indictment describes who Sami is, it says that, "Defendant MAHMOOD SAMI KHAN ("KHAN") was employed by Anosh, Inc. as Director of Operations, since at least in or around 2021. KHAN also was the owner/director of clinical laboratories, including two of AHMED's Non-Operational Texas Labs, Apollo Labs and Artemis Labs, from on or about December 1, 2021, to at least June 2022." There is no mention of OCL. There is also no allegation in the Indictment connecting Anosh Inc. to OCL or the OCL scheme.

for Lab A), then Ahmed (but with his control concealed), then Sami along with Individual F, then Individual F. *Id*. at pars. 32-35. Individual B (a biller) was assigned by Ahmed to do the billing for Lab A. *Id*. at p. 24, par. 34.  Ahmed and Sami are alleged to have caused thousands of false claims to be to HRSA via Lab A. *Id*. at par. 36. Ahmed caused those false claims were to be hidden from Individual D, who was still the owner apparently, by preventing Individual D and other employees of Lab A from accessing billing records. *Id*. at par. 37.

The fraud scheme allegations conclude by alleging that Ahmed, Sirajudeen, and Sami took steps to conceal the scheme. *Id*. at pp. 25-29, pars. 38-39. The only concealment allegations specifically referencing Sami is that he, along with Ahmed and Chaudhry, concealed Ahmed's ownership and control of the Non-Operational Texas Labs by using Sami's name on ownership and bank documents and omitting Ahmed's name from those documents. *Id*. at p. 28, par. 38h.

**Counts Fifteen through Seventeen (anti-kickback violations)**

Count Fifteen charges a conspiracy between Ahmed and Sirajudeen (only Ahmed is charged) to violate the anti-kickback provisions of 42 U.S.C. § 1320a-7b(b)(1)(B). *Id*. at p. 33, par. 2. Sami is not charged in Count Fifteen, nor is he referenced in any of its paragraphs. *Id*. at p. 33-37, pars. 1-9. Count Fifteen does incorporate various paragraphs from Counts One through Fourteen. *Id*. at p. 33, par 1. But, with the exception of the general concealment allegation (p. 25, par. 38) none of the incorporated paragraphs reference Sami. The paragraph which describes who Sami is (p. 9, par. 1t) is not re-incorporated; the paragraphs related to Ahmed's Non-Operational Texas Labs (pp. 17-24, pars. 21-31) are not incorporated; paragraphs related to Lab A (pp. 24-25, pars. 32-37) are not incorporated; and, the concealment paragraph specifically referencing Sami (p. 28, par. 38h) is not incorporated.

The conspiracy charged in Count Fifteen also references only a single lab, OCL, and the conspiracy is alleged to have spanned from June 2021 to September 2021, the time period during which OCL was able to submit claims to HRSA. *Id*. at p. 33, par. 2. The Anti-Kickback conspiracy also involves Westside Pharmacy, Chicago Polyclinic, Chicago Polyclinic DBAs, and Global Healthcare. *Id*. at pp. 34-36, pars. 3-7. Those entities are all alleged to be owned and operated by Ahmed or Sirajudeen. *Id*. at pp. 8-9, pars 1q, 1s.

It is abundantly clear, therefore, that Count Fifteen relates to Ahmed, Sirajudeen, and OCL only, and does not involve the Texas labs or other defendants.

Likewise, Counts Sixteen and Seventeen, charging substantive anti-kickback violations against Ahmed and naming Sirajudeen, relate only to those defendants and OCL. The same paragraphs from the wire fraud scheme are incorporated; the dates of the charged transactions occur during the period that OCL was able to bill HRSA, no other labs are referenced; and, no other individuals are referenced. *Id*. at pp. 38-39, pars 1-2.

**Count Eighteen**

Count Eighteen charges Ahmed alone with the wrongful obtaining of individually identifiable healthcare information in violation of 42 U.S.C. § 1320d-6(a)(2) and (b)(3). *Id*. at p. 39. Although this Count incorporates paragraphs 1 through 37 of Counts One through Fourteen, the offense charged occurred on a specific date – April 14, 2021. *Id.* The place from which the health information was obtained is also specified – Hospital A. *Id*. The only incorporated reference tied to April 2021 and Hospital A is the allegation that Ahmed and Individual F obtained patient information from Hospital A. Neither Sami, nor any other defendant, is implicated in the offense charged in Count Eighteen.

**Count Nineteen**

Count Nineteen charges Ahmed, Sami and Chaudhry (and names but does not charge Sirajudeen) with money laundering conspiracy from August 2021 through January 2023, in violation of 18 U.S.C. § 1956(h). *Id*. at pp. 40-41. This money laundering conspiracy charges two objects of the conspiracy: (1) concealment money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and (2) transactional money laundering in violation of 18 U.S.C. § 1957. *Id*. at pars. 2a & b. In addition to alleging two objects of the conspiracy, Count Nineteen alleges two different unlawful activities as sources of proceeds or criminally derived proceeds: (1) wire fraud and (2) violations of the Anti-Kickback Statute. *Id*. Count Nineteen incorporates all of the paragraphs of Counts One through Fourteen (the wire fraud scheme) and all of the paragraphs of Count Fifteen (the anti-kickback conspiracy). *Id*. at p. 40, par. 1. It does not, however, list any specific financial transaction as being part of the money laundering conspiracy.

**Counts Twenty through Twenty-Four**

These Counts charge substantive concealment money laundering (18 U.S.C. 1956(a)(1)(B)(i) against Ahmed (Counts 20, 21, 22 and 24) and Sirajudeen (Count 23). *Id*. at pp. 42-43. All of the paragraphs of the wire fraud scheme (Counts 1-14) and the anti-kickback conspiracy (Count 15) are incorporated in these Counts. *Id*. ap. 42, par. 1. The dates of the five financial transactions range from August 12, 2021 through September 8, 2021 - the time period that OCL was actively billing and *prior* to the start of the "Ahmed's Non-Operational Texas Labs" allegations. *Id*. at pp. 42-44; p. 17, par. 21 (indicating that the Texas labs scheme began in November of 2021). The entities involved in the charged financial transactions are Westside Pharmacy, Gold Oak Capital, Chicago Polyclinic, OCL, and B2B Global USA. *Id*. at pp. 42-43.

All of these companies are owned or controlled by Ahmed or Sirajudeen, and none are alleged in the Indictment to be affiliated with any other Defendant, including Sami.

Based on the date range and the companies involved, it is apparent that Counts Twenty through Twenty-Four charge money laundering related to OCL; that is, the OCL aspect of the wire fraud scheme and/or the OCL anti-kickback conspiracy.

### III. The Court should Sever Sami from Defendants Ahmed and Sirajudeen and Preclude Evidence Related Solely to Them

Acknowledging that it is somewhat unusual to request a severance from defendants who, by all appearances, will not be participating in the trial, counsel nevertheless believe a severance is warranted here to preclude the admission of irrelevant and prejudicial evidence related solely to those defendants; that is, (1) evidence related to OCL and the fraud committed through OCL by Ahmed and Sirajudeen; (2) evidence related to Hospital A; (3) evidence related to anti-kickback violations and wrongful obtaining of healthcare information; and (4) evidence related to money laundering charged in Counts Twenty through Twenty-Four.

With regard to severance based on prejudicial joinder, Rule 14 of the Federal Rules of Criminal Procedure states, in part, as follows:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Fed. R. Crim P. 14

Although the Rule states that a severance may be granted if a joint trial merely "appears" to prejudice a defendant, courts in this circuit have made clear that defendants seeking severance due to prejudice face a substantial hurdle.

> A defendant who moves for severance must demonstrate that, absent severance, he is likely to be unable to obtain a fair trial. *United States v. Stokes*, 211 F.3d 1039,

> 1042 (7th Cir. 2000); see also *United States v. Donovan*, 24 F.3d 908, 915 (7th Cir. 1994) ("The defendant's burden is to demonstrate 'severe prejudice' resulting from the district court's refusal to sever." (*quoting United States v. Curry*, 977 F.2d 1042, 1050 (7th Cir. 1992))). To meet his burden, the defendant must demonstrate that "there is a serious risk that a joint trial would compromise a specific trial right ... or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). "'*In all but the most unusual circumstances*, the risk of prejudice arising from a joint trial is outweighed by the economies of a single trial in which all facets of the crime can be explored once and for all.'" *Goodwin*, 496 F.3d at 644 (quoting *United States v. Carrillo*, 435 F.3d 767, 778 (7th Cir. 2006)) (emphasis added).

*United States v. Zheng*, 2016 WL 7116580 at *2 (N.D. Ill. 2016).

While the hurdle is undoubtedly high, it is not insurmountable. It is still the law in this circuit that "a single joint trial, however desirable from the point of view of efficient and expeditious criminal adjudication, may not be had at the expense of a defendant's right to a fundamentally fair trial." *United States v. Echeles*, 352 F.3d 892, 896-97 (7th Cir. 1965), *citing*, *Barton v. United States*, 263 F.2d 894, 898 (5th Cir. 1959); *United States v. Kahaner*, 203 F.Supp. 78, 80-81 (S.D.N.Y.1962); *Schaffer v. United States*, 221 F.2d 17, 19, 54 A.L.R.2d 820 (5th Cir. 1955); *United States v. Haupt, supra*, 136 F.2d at 671; *Hale v. United States*, 25 F.2d 430, 438-439 (8th Cir. 1928). And, it is still the law in this circuit that "[d]enial of a motion for severance may be an abuse of discretion if there is a great disparity of evidence between the moving defendant and his codefendants." *United States v. Moya-Gomez*, 860 F.2d 706, 765 (7th Cir. 1988).

Moreover, the Seventh Circuit has instructed that courts "should vigilantly monitor for developing unfairness and should not hesitate to order severance at any point after indictment if the risk of real prejudice grows too large to justify whatever efficiencies a joint trial does provide." *United States v. Coleman*, 22 F.3d 126, 134 (7th Cir. 1994). The Seventh Circuit has also explained that its deference to district courts on Rule 14 decisions is not due to a general distaste for severance, but because district courts are in the best position to gauge potential prejudice. *Id*. ("We

review Rule 14 severance decisions—which are most frequently denials—for abuse of discretion out of a recognition that the district court is peculiarly qualified to discharge this function, not to signal any general disapproval of severance when appropriate in the interest of justice.")

Although there are many situations that may justify a severance, the Supreme Court has identified some circumstances that are particularly relevant here. Such circumstances include: (1) where evidence that the jury should not consider against a defendant, and that would not be admissible if a defendant were tried alone, is admitted against a codefendant; (2) relatedly, where evidence of a codefendant's wrongdoing could erroneously lead a jury to conclude that a defendant was guilty; or (3) where defendants are tried together in a complex case with different degrees of culpability; *Zafiro*, 506 U.S. at 539.

Keeping these circumstances and the Seventh Circuit's direction to closely monitor prejudice in mind, district courts have, albeit rarely, granted severances under appropriate circumstances. For example, in *United States v. Stoecker*, 920 F.Supp. 876, 884-86 (N.D. Ill. 1996), Judge Gettleman granted a severance in part on the basis that there was a gross disparity in the evidence between the moving defendant (who was named in 3 of 58 counts) and the other defendants. *Id*. ("'gross disparity' in the evidence presents a danger that some defendants will suffer 'spillover prejudice' due to the accumulation of evidence against other defendants. When that occurs, a defendant may suffer a transference of guilt merely due to his association with a more culpable defendant.") *citing*, *United States v. Andrews*, 754 F.Supp. 1161, 1177–78 (N.D. Ill. 1990), *citing*, *United States v. Garner*, 837 F.2d 1404, 1413 (7th Cir. 1987).

Similarly, in *United States v. Troutman*, 546 F.Supp.2d 610 (N.D.Ill. 2008), Judge Castillo granted a severance for the codefendant (Gilbert) of a Chicago Alderman. Gilbert, although mentioned in the fraudulent scheme charged in the indictment's first count, was not charged in that

count.  He was charged in a single count only.  *Id*. at 617.  Judge Castillo found that there was a gross disparity in the evidence between Gilbert and his codefendant, and that because he was not charged in the scheme charged in Count One, much of the evidence may be inadmissible against him in a separate trial.  *Id*.   In sum, Judge Castillo concluded that, "it is too much to ask the jury in this case to ignore the vast quantity of evidence in this case that is not relevant to the one count in which Gilbert is charged."  *Id*.

Here, the Court is faced with the most unusual of circumstances which turns the typical concerns about the economies of a single trial on its head. Here, the absence of a severance would needlessly (and prejudicially) lengthen the upcoming trial. It would also create the possibility of a second trial, pointlessly identical to the first.

 The two defendants, Sirajudeen and Ahmed, from whom the defense seeks a severance, will not be participating in the upcoming trial. Sirajudeen is a cooperator and will testify at the upcoming trial. A severance will not necessitate a second trial for him – he is not going to trial. Ahmed however is a fugitive. Unless he is somehow apprehended very soon - soon enough that he could participate in the upcoming trial – he will also not be participating. He may one day require a trial of his own if and when he is apprehended. The severance requested here would conserve judicial resources by avoiding two lengthy, identical trials.

Moreover, the allegations that are solely related to Ahmed and Sirajudeen that the defense seeks to preclude are easily separable. As explained above, the scheme to defraud charged in Counts One through Fourteen begins with the OCL scheme. As plainly alleged in the Indictment, the OCL scheme was perpetrated by Ahmed and Sirajudeen. Neither Sami, nor the other defendant (Chaudhry), is mentioned. The OCL scheme also has a specified beginning and end date – June 2021 until September 2021 when OCL was no longer able to submit bills to HRSA. As clearly

alleged in the Indictment, the OCL scheme ends two months before the "Ahmed's Non-Operational Texas Laboratories" scheme (in which Sami is named) begins. Precluding the OCL scheme from the trial is a simple matter – neither of the defendants who will be on trial participated in the OCL scheme anyway and the dates do not overlap.

Likewise, the allegations about Hospital A (a local hospital from which Ahmed stole patient information) is easily separable. Sami is not alleged to have any connection with Hospital A. He is not alleged to have obtained patient information from there, and there is no allegation he was even aware that patient data was obtained from Hospital A.[4] Again, these allegations are easily separable.

The anti-kickback violations and wrongful obtaining of healthcare information charged in Counts Fifteen through Eighteen are likewise easily separable. Only Ahmed and Sirajudeen are charged in those counts; only those two are alleged to have participated in those activities; the kickbacks relate only to the OCL scheme; and, the wrongfully obtained healthcare information was taken by Ahmed from Hospital A. Again, Sami had nothing to do with these allegations. Those charges and allegations are easily separable.

Just so for the money laundering offenses charged in Counts Twenty through Twenty-Four. Only Ahmed and Sirajudeen (in Count 23) are charged in these counts, and only those two are alleged as participants. The financial transaction comprising the counts relate to the OCL fraud and/or the anti-kickback scheme – Ahmed and Sirajudeen offenses. There is no difficulty in separating these charges and allegations from the upcoming trial.

Lastly, the admission of this Ahmed and Sirajudeen evidence in Sami (and Chaudhry's) trial is wildly prejudicial. It implicates the very first concern expressed in *Zafiro*, "evidence that

---

[4] The same is true for Chaudhry.

the jury should not consider against a defendant, and that would not be admissible if a defendant were tried alone, is admitted against a codefendant." *Zafiro*, 506 U.S. at 539. The evidence the defense seeks to preclude is not admissible against Sami. He is not charged with most of it (all of the counts naming Ahmed and Sirajudeen only), and the OCL fraud allegations (which are included in the general scheme to defraud) do not implicate Sami. This evidence is irrelevant and should not be admitted.

Other concerns from *Zafiro* are implicated as well. A jury may have difficulty separating Ahmed's conduct from the evidence related to Sami, and may conclude that Sami is guilty because of the vast evidence against Ahmed, and Sami's association with him. *Id*. ("evidence of a codefendant's wrongdoing could erroneously lead a jury to conclude that a defendant was guilty"). Likewise, admitting the Ahmed and Sirajudeen evidence would make the trial significantly more complex, and there is a vast difference in culpability between those defendants and Sami.[5] Again, *Zafiro* identified this very danger. *Id*. ("defendants are tried together in a complex case with different degrees of culpability").

In summary the risk of Sami suffering from "spillover prejudice" from the above-described evidence is great. A jury may well conflate the evidence against Ahmed and Sirajudeen with evidence that is properly admissible against Sami even if the jury were provided with limiting instructions. There is also a significant risk that Sami would suffer from a "transference of guilt" in light of the significant evidence unrelated to him that would be presented at a joint trial. As Judge Castillo concluded in *Troutman*, it is simply "too much to ask" of a jury to ignore a vast

---

[5] For example, as discussed below, the anti-kickback violations alone are extraordinarily complex. Requiring a defendant who is not even charged with those offenses to defend them would be an additional layer of prejudice and needless lengthening of the trial.

quantity of evidence that is inadmissible for a particular defendant. *Troutman,* 546 F.Supp.2d at 617.

Severance is appropriate in the unusual circumstances presented here. Not only would it ensure that needlessly prejudicial evidence is precluded so that Sami can obtain a fair trial, but it would also result in the *conserving* of judicial resources. If Ahmed is someday captured, then he can have a lengthy trial covering all of the allegations against him. There is no reason to try that lengthy case twice.

**IV.    Count Nineteen is Duplicitous; Alternatively Allegations Related to OCL and Anti-Kickback Violations should be Precluded**

**A. Count Nineteen is Duplicitous**

Pursuant to Rule 12(b)(3)(B) of the Federal Rules of Criminal Procedure, one of the specific bases upon which a defendant may move to dismiss a defective indictment is the, "(i) joining two or more offenses in the same count (duplicity)." Fed. R. Crim. P. 12(b)(3)(B). Duplicity is appropriately addressed in pretrial motions. *United States v. Caputo*, 288 F.Supp.2d 912, 918 (N.D. Ill. 2003), *citing*, *United States v. Magana*, 118 F.3d 1173, 1189 (7th Cir. 1997). Rule 8(a) of the Federal Rules of Criminal Procedure governs the joinder of offenses and requires that an indictment charge a separate count for each offense. In general, a count is duplicitous if it "charges more than one distinct and separate offense." *United States v. Berardi*, 675 F.2d 894, 897 (7th Cir. 1982); *United States v. Shorter*, 874 F.3d 969, 976 (7th Cir. 2011).

For the purpose of analyzing a motion to dismiss, the allegations in the indictment are taken as true and viewed in a light most favorable to the Government. *United States v. Clark*, 728 F.3d 622, 623 (7th Cir. 2013).; *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999). In determining whether a count is duplicitous, courts look to "(1) whether defendant's alleged actions may legitimately be regarded as a single course of conduct during a discrete time period; and (2)

whether defendant would be prejudiced by h[er] prosecution on a single-count basis." *United States v. O'Brien*, 2017 WL 5192032, at \*4 (N.D. Ill. Nov. 9, 2017) (internal quotation marks omitted), *aff'd,* 953 F.3d 449 (7th Cir. 2020).

Where more than one offense is charged in a single count, that count is duplicitous, and must be either dismissed, or the government may elect to proceed on a specified offense. *See*, *United States v. Hughes*, 310 F.3d 557, 560 (7th Cir. 2002); *United States v. Ziedman*, 540 F.2d 314, 318 (7th Cir. 1976). The prohibition against duplicity is designed to protect a variety of defendants' rights. *See, e.g.*, *United States v. Shorter*, 874 F.3d 969, 976-977 (7th Cir. 2017). First and foremost, duplicitous charging impacts a defendant's fundamental right to a unanimous verdict. Where more than one scheme is charged in a single count, individual jurors may render verdicts based on different schemes, and a general verdict form will not reveal whether a defendant was, in fact, found guilty of one scheme but not another, or whether a defendant was acquitted on one or more of the blended offenses. *United States v. Buchmeier*, 255 F.3d 415, 425 (7th Cir. 2001) ("The overall vice of duplicity is that the jury cannot in a general verdict render its finding on each offense, making it difficult to determine whether a conviction rests on only one of the offenses or both."). In short, "collapsing separate offenses into a single count . . . prevents the jury from convicting on one offense and acquitting on another." *United States v. Campbell*, 279 F.3d 392, 398 (6th Cir. 2002).

Duplicitous charging can also violate a defendant's Fifth and Sixth Amendment rights to notice of the charges against him and can impact the Fifth Amendment's protection against double jeopardy. The inherently ambiguous nature of a duplicitous Count could allow prosecutors to bring charges based on some part of the blended offenses. *See*, *Buchmeier*, 255 F.3d at 415; *United*

16

*States v. Berardi*, 675 F.2d 894, 897 (7th Cir. 1982); *United States v. Tanner*, 471 F.2d 128, 139 (7th Cir. 1971).

Particularly apropos here, duplicitous charging also creates the risk of prejudicial evidentiary rulings; for example, that evidence which would be deemed irrelevant or otherwise inadmissible might be admitted because it relates to one of the improperly blended offenses. The sentencing process can also be adversely affected. *See*, *e.g.*, *United States v. Starks*, 472 F.3d 466, 470–71 (7th Cir. 2006) ("[A] duplicitous indictment may expose a defendant to other adverse effects including improper notice of the charges against him, prejudice in shaping of evidentiary rulings, in sentencing, in limiting review on appeal, and in exposure to double jeopardy."); *United States v. Marshall*, 75 F.3d 1097, 1111 (7th Cir. 1996); *Buchmeier, supra.*

Distinguishing an impermissibly duplicitous count from a count which simply charges multiple means of committing a single offense has been described as a "difficult" evaluation. *Berardi*, 675 F.2d at 898. Courts look to the statute defining the offense and attempt to determine, "Congress' intended unit of prosecution" for the offense. *Buchmeier*, 255 F.3d at 421. A conspiracy charge is not duplicitous simply because it has multiple illicit objectives, each of which constitutes a crime. *Braverman v. United States*, 317 U.S. 49, 54 (1942); *United States v. Hughes*, 310 F.3d 557 (7th Cir. 2002). But, a conspiracy charge may nevertheless be duplicitous where it alleges separate conspiracies. *See*, *e.g.*, *United States v. Munoz–Franco*, 986 F.Supp. 70, 71 (D.P.R. 1997); *United States v. Gabriel*, 920 F.Supp. 498, 503 (S.D.N.Y. 1996), aff'd, 125 F.3d 89 (2d Cir. 1997) (finding conspiracy charge duplicitous but declining to dismiss charge based on Second Circuit case law), Separate conspiracies exist "when each of the conspirators' agreements has its own end, and each constitutes an end in itself." *United States v. Sababu*, 891 F.2d 1308, 1322 (7th Cir. 1989), *see also Blumenthal v. United States*, 332 U.S. 539, 558–59 (1947). The

Seventh Circuit often references "hub and spoke" conspiracies in which, "a defendant serves as a 'hub' connected to each of his co-conspirators via a 'spoke.'" *United States v. Avila*, 557 F.3d 809, 814 (7th Cir. 2009). To be a single conspiracy, "a rim must connect the spokes together, for otherwise the conspiracy is not one but many." *United States v. Bustamante*, 493 F.3d 879, 885 (7th Cir. 2007). "What is required is a shared, single criminal objective, not just similar or parallel objectives between similarly situated people." *United States v. Small*, 423 F.3d 1164, 1182 (10th Cir. 2005), *quoting United States v. Evans*, 970 F.2d 663, 670 (10th Cir. 1992)

Here, the face of the Indictment makes clear that Count Nineteen alleges not a single conspiracy, but two separate conspiracies. This is so not simply because the conspiracy alleges that the agreement was to violate two separate statutes, 1956 (a)(1)(B)(i) and 1957,[6] and not simply because the conspiracy has multiple illicit objectives. There are two separate conspiracies because, as alleged in Count Nineteen, the conspiratorial agreement was to launder money from two specified unlawful activities – wire fraud and anti-kickback violations. The rest of the Indictment, much of which is incorporated into Count Nineteen, makes clear, however, that Sami had nothing whatsoever to do with anti-kickback violations and no knowledge of those violations. More critically, the Indictment does not allege Sami's awareness of *any form* of unlawful activity at OCL, anti-kickback or otherwise. Simply put, Sami could not have agreed to launder money generated via anti-kickback violations or any form of unlawful activity at OCL because he is not alleged to have known of any unlawful activity there at all. There are in reality two conspiracies charged in Count Nineteen: a conspiracy to launder money generated by OCL (by wire fraud and

---

[6] That the conspiracy alleges violations of two different statutes does raise some problems, however. The two statutes are both money laundering, but they use different terms and definitions which will complicate jury instruction. For example, 1956 uses "some form of unlawful activity" while 1957 uses "criminally derived property." These terms have different definitions. Moreover, 1956 and 1957 have different statutory maximums. The actual conspiracy charge, 1956(h), indicates that the punishment is determined by the object of the conspiracy. Any verdict, therefore, will have to make sure there is unanimous agreement as to which object forms the basis of any conviction.

anti-kickback violations), and a conspiracy to launder money generated by other labs (via wire fraud only) after OCL was effectively shut down by HRSA. Based on the face of the Indictment, Sami can only arguably be a member of the latter conspiracy.

Although knowledge of a specified unlawful activity may not be required,[7] knowledge that the money being laundered was derived from illegal activity is required by both sections 1956 and 1957. For example, a 1956 violation requires proof that "the defendant knew that the property involved in the financial transaction represented the proceeds of some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law." *See*, Seventh Circuit Pattern Instruction (2023 ed.), 18 U.S.C. § 1956 Definition of Knowledge Requirement. Similarly, although using different language, the jury instructions for 1957 require proof that the defendant knew the transaction involved "criminally derived property," meaning "property constituting, or derived from, proceeds obtained from a criminal offense." *See*, Seventh Circuit Pattern Instruction (2023 ed.), 18 U.S.C. § 1957 Elements and Definitions.

These knowledge requirements demonstrate that Count Nineteen charges two separate conspiracies. Sami cannot have conspired to launder money generated through crimes at OCL. As far as the Indictment shows, he knows nothing about OCL at all, much less that OCL generated money through "activity that constitutes a felony under State, Federal, or foreign law" or "proceeds obtained from a criminal offense."

One additional point demonstrates that there are two conspiracies charged in Count Nineteen: (1) an OCL money laundering conspiracy and (2) a Texas Labs and Lab A money

---

[7] The knowledge requirement for 1956(a)(1)(B)(i) violations is not perfectly clear. Despite what the pattern jury instructions say, the Seventh Circuit indicated, as recently as June of this year when discussing a 1956(a)(1)(B)(i) charge, that, "[t]o establish money laundering, 'the government must prove that the defendant engaged or attempted to engage in a financial transaction, knowing that the transaction involved the proceeds of *a specified unlawful activity*.'" *United States v. Matthews*, 140 F.4th 893, 898 (7th Cir. 2025) (emphasis added). For purposes here, the Indictment does not allege knowledge by Sami of *anything* related to OCL. Regardless of the level of knowledge required for money laundering, Sami does not have it regarding OCL.

laundering conspiracy. The substantive money laundering counts that follow Count Nineteen, Counts Twenty through Twenty-Four, each allege a specific transaction. Each of these transactions relates to OCL, and each charges only Ahmed or Sirajudeen. How do we know that these are all OCL related transactions? Because the dates of the charged transactions, August 12, 2021 through September 8, 2021, all predate the start of the Texas Labs scheme (November 1, 2021 according to the Indictment) and the Lab A scheme (December 2021 according to the Indictment). While perhaps not dispositive, these substantive money laundering counts, involving OCL, wire fraud, anti-kickback violations, but charging Ahmed and Sirajudeen only, strongly suggest that OCL money laundering is an agreement between those two defendants alone.

**B.      Evidence Related to OCL and Anti-Kickback Violations Should be Precluded**

In the event the Court does not determine that Count Nineteen is duplicitous, the defense submits that the OCL and anti-kickback allegations and related evidence should be precluded and excised from Count Nineteen on the same basis as is discussed in Section III (severance). Without repeating the arguments above, the perpetrators of the OCL fraud and anti-kickback scheme, Ahmed and Sirajudeen, should be severed. Evidence and allegations related solely to them in Count Nineteen – money laundering of proceeds of OCL fraud and anti-kickback violations – should be precluded. Such evidence would be irrelevant to and prejudicial to Sami.

But there is another good reason to preclude and excise the anti-kickback aspects of Count Nineteen. Not only will it prejudice Sami, but it may well result in an inordinate expenditure of time. No one who will be participating in the upcoming trial is charged with any anti-kickback violation. Nevertheless, as Count Nineteen stands, because they must prove that the funds laundered were the proceeds of specified unlawful activity, the government will be required to prove that the anti-kickback statute was in fact violated by Ahmed and Sirajudeen. One need only

look at the pattern jury instructions and two pages of committee comments to see that the anti-kickback statute is complex and with multiple issues from case law related to, for example, the statute's elements of knowledge and willfulness. *See*, Seventh Circuit Pattern Instruction (2023 ed.), "42 U.S.C. § 1320a-7b(b) Criminal Penalties for Acts Involving Federal Health Care Programs—Illegal Remunerations."

The anti-kickback statute is further complicated by the fact that it contains numerous safe-harbor provisions that can make the conduct lawful. *See, e.g., United States v. George*, 900 F.3d 405, 413 (7th Cir. 2018). But to defend a prosecution based on a safe harbor, case law explains that "[o]nce the government establishes the elements of a violation of the Anti-Kickback Statute, the burden shifts to a defendant to demonstrate by a preponderance of the evidence that her conduct fell within the safe harbor provision of the statute." *Id*. Who could take on that burden here? The two anti-kickback perpetrators will not be on trial, and the defendants who will be on trial had nothing to do with OCL or any anti-kickback violations. How are the defendants or their counsel meant to marshal an absent defendant's safe harbor defenses? This is another area of prejudice that a severance could properly address. And, even if the defendants on trial could somehow muster someone else's safe harbor defenses, such defenses would likely require experts, other testimony and evidence, and would inevitably result in a significant expenditure of time.

Evidence and allegations related to anti-kickback violations should be excluded, even as related to Count Nineteen. Such allegations are irrelevant, prejudicial, and likely to result in a significant waste of time.

## V.      A Bill of Particulars Is Necessary for Count Nineteen

Count Nineteen alleges a money laundering conspiracy involving four defendants and spanning from August 2021 through January 2023. Although money laundering is, of course,

based on financial transactions, Count Nineteen does not identify a single financial transaction. The defense requests a bill of particulars listing the specific financial transactions that form the conspiracy charged in Count Nineteen.[8]

Rule 7(f) of the Federal Rules of Criminal Procedure authorizes the court to "direct the government to file a bill of particulars" in its discretion. Fed. R. Crim. P. 7(f); *United States v. Hedman*, 458 F. Supp. 1384, 1385 (N.D. Ill. 1978). "A bill of particulars is necessary when an indictment lacks sufficient detail to allow a defendant to prepare for trial, avoid prejudicial surprise, or protect himself against double jeopardy." *United States v. Ramirez- Padilla*, 2014 WL 1560952, at *1 (N.D. Ill. Apr. 18, 2014) (citation omitted); *United States v. Kendall*, 665 F.2d 126, 135 (7th Cir. 1981) (describing the defendant's "constitutional right [] to know the offense in which he is charged"). A bill is also essential to "prevent the prosecution from changing its theory of the case" as the case progresses and to safeguard a defendant's constitutional rights. *United States v. Doe*, 572 F.3d 1162, 1176 (10th Cir. 2009); *see also United States v. Wilson*, 1994 WL 777319, at *15 (E.D. Wis. Nov. 30, 1994) ("The purpose of a bill of particulars is to provide the defendant with sufficient information about the charges to prepare an adequate defense and to protect the defendant's double jeopardy rights, in accordance with the defendant's Fifth and Sixth Amendment rights.").

"The test in passing on a motion for a bill of particulars should be whether it is necessary that defendant have the particulars sought in order to prepare his defense and in order that prejudicial surprise will be avoided." *Hedman*, 458 F. Supp. at 1385 (citation omitted). "In considering whether to require a bill of particulars, [the] court may consider the complexity of the

---

[8] The defense recognizes that money laundering conspiracies do not require proof of overt acts. *Whitfield v. United States*, 543 U.S. 209, 125 S. Ct. 687, 160 L. Ed. 2d 611 (2005). Nevertheless, in light of the broad conspiracy charged, and the voluminous discovery, a bill of particulars is appropriate here.

charges, the clarity of the indictment, and the degree of discovery available to the defense absent a bill of particulars." *United States v. Vasquez-Ruiz*, 136 F. Supp. 2d 941, 942–43 (N.D. Ill. 2001). This test overlaps with – but is distinct from and more lenient than – the analysis of whether an indictment is sufficiently pleaded under Rule 7(c) or the U.S. Constitution. *See, e.g.*, *United States v. Mosley*, 786 F.2d 1330, 1335 (7th Cir. 1986) ("[w]hen an indictment contains all the essential elements of the charged offense, the accused may [still] obtain the factual proof supporting the charges, if vital to his defense, by a motion for a bill of particulars"); *United States v. Risk*, 672 F. Supp. 346, 360 (S.D. Ind. 1987), aff'd, 843 F.2d 1059 (7th Cir. 1988) ("[T]he indictment, while constitutionally adequate to inform the defendant of the offense charged, is insufficient to enable him to prepare for trial and to prevent surprise.")

Discovery can, of course, assist a defendant in preparing for trial. But voluminous discovery may, in certain circumstances, exacerbate the need for a bill of particulars. *See*, *United States v. Budic*, 2021 WL 6755012 at \*4 (E.D. Wis. Oct. 6, 2021)*, citing*, *United States v. Arberry*, 2007 WL 9706396 at \*2 (E.D. Wis. Feb. 15, 2007) ("the lack of specificity in the charges combined with the production of the voluminous documents will occasionally prompt judges to order a bill of particulars") *quoting* Barry Tarlow, When Too Much Discovery Is Not Enough, 26 Mar. Champion 56 (2002); *United States v. Vasquez-Ruiz*, 136 F. Supp. 2d 941, 943 (N.D. Ill. 2001) ("The defense should not be left to its own devices and a sifting of the voluminous materials that have been provided in order to divine the particulars of these critical allegations, which have not yet been disclosed.")

Under the circumstances here, the defense cannot begin to adequately prepare to defend Count Nineteen without some identification of the specific financial transactions at issue. The charge spans nineteen months, alleges that four people (three charged defendants and Sirajudeen)

were conspirators, incorporates every paragraph of the fraud and anti-kickback charges, and (because of that incorporation) potentially involves every single entity and bank account listed in the Indictment (and maybe others that are not listed). The conspiracy also alleges the violation of two different statutes 1956 (which has no minimum dollar amount for the transaction) and 1957 (which has a $10,000 minimum dollar amount for the transaction), meaning any transaction of any amount within the nineteen month time frame is potentially at issue. In addition to two different statutes, the charge also alleges two different crimes generating proceeds – wire fraud and anti-kickback violations. Count Nineteen charges a massively wide conspiracy.

Also massive is the amount of discovery that has been tendered. The first two productions of discovery were of more than 1 million pages each. While there may still be more bank records to come, according to a government discovery index, documents described as "bank records" related to Sirajudeen only exceed 65,000 pages. There are also other discovery folders containing financial records which are not Bates numbered and thus not easily countable, but which are similarly voluminous. Presumably, within those bank and financial records are transactions that are part of the charged conspiracy and transactions that are not. But, the defense cannot hope to identify which is which on their own. Even if a defendant could identify transactions he personally conducted, the charge is conspiracy and transactions conducted by others are likely included in Count Nineteen as well.

Identification of the specific transactions at issue is not simply helpful to the defense, it is critical and necessary. Of course, all of the elements of money laundering must be proven. The defense cannot examine whether any element is established, however, without identified transactions. Other defenses are at issue as well. For example, money laundering criminalizes transactions *in* criminal proceeds, not transactions that create the proceeds. *United States v. Castro-*

*Aguirre*, 983 F.3d 927, 941 (7th Cir. 2020). Without identified transactions, this distinction cannot be analyzed.

The lack of identified transactions also creates a risk of double jeopardy. As charged there are an untold number of financial transactions which may or may not be part of the conspiracy charged in Count Nineteen. Without a bill of particulars, Count Nineteen cannot be raised as a bar against a future prosecution. What is the defendant to say? I think the transaction I am newly charged with falls within Count Nineteen?

A bill of particulars listing the financial transactions that are charged as part of Count Nineteen is essential. Under the circumstances here, the charge cannot be adequately defended without it.

**VI.     Conclusion**

In light of the above, Defendants Mahmood Sami Khan respectfully request that the Court grant: (1) his motion for severance of defendants Ahmed and Sirajudeen and to preclude evidence (Docket  No. 67 ); (2) his motion to dismiss Count 19 as duplicitous or to preclude from that count evidence related to OCL and anti-kickback violations (Docket No. 68) ; and, (3) for a bill of particulars related to Count 19 (Docket No. 69).

DATED: November 7, 2025

s/Patrick Blegen

Patrick Blegen
BLEGEN & ASSOCIATES
53 West Jackson Blvd., Suite 1424
Chicago, IL 60604
Telephone: (312) 957-0100
pblegen@blegengarvey.com

s/Gabrielle R. Sansonetti

Gabrielle R. Sansonetti
LEINENWEBER, DAFFADA, &
SANSONETTI
120 N. LaSalle Street, Suite 2000
Chicago, Illinois 60602
(773)716-6117
gabrielle@ilesq.com