# IN THE IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 25 CR 321-3 |
| | ) | Hon. Sharon Johnson Coleman |
| ANOSH AHMED, *et al.* | ) | |
| (MAHMOOD SAMI KHAN), | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS KHAN'S REPLY
## IN SUPPORT OF HIS PRETRIAL MOTIONS

Defendant, MAHMOOD SAMI KHAN ("Sami"), by and through his attorneys, hereby replies to the Government's Response (Dkt. 75[1]) to Sami's motions to: (1) to sever counts relevant only to codefendants Ahmed and Sirajudeen and to preclude evidence related only to those counts (Dkts. 62, 63 (Chaudry "Suhaib"); 67, 70 (Sami)); (2) to dismiss Count 19 as duplicitous or to preclude evidence (Dkt. 68, 70 (Sami, Suhaib joins); and, or in the alternative, (3) for a bill of particulars related to Count 19 (Dkt. 69, 70 (Sami, Suhaib joins)). The Government's Response raises more questions than it answers, so supplementing the initial motions, Sami moves to dismiss Count 19, for failure to state and offense or, in the alternative, an additional bill of particulars related to the O'Hare Clinical Labs (OCL) scheme. Fed. R. Crim. P. 7(c)(1); 12(b)(3)(B)(iii) & (v).

---

[1] Dkt. 75 will be referred to as (Gov. Br.) throughout.

**Table of Contents**

INTRODUCTION.................................................................................................................. 1

I.  The Indictment Does Not Charge "[A] Single Widespread Scheme" But Rather, Two Schemes – And, Sami Is Not Alleged To Have Been Involved in the Earlier OCL Scheme. ..................................................................................................................... 4

II.  Count 19 Is Either Duplicitous or Insufficiently Pled – Either Way, It Should be Dismissed. .......................................................................................................................... 17

III.  In the Alternative, A Bill of Particulars is Required to Appropriately Advise Defendants of the Charges Against Them With Respect to the OCL Scheme and the Count 19 Money Laundering Allegations. .......................................................................... 22

IV.  Defendant Sami Khan Joins Co-Defendant Suhaib Chaudry's Response to His *Brady* Motion. .................................................................................................................... 24

V.  Conclusion...................................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

Hamling v. United States, 418 U.S. 87 (1974) ........................................................... 20

United States v. Coleman, 22 F.3d 126 (7th Cir. 1994) ........................................... 14

United States v. Hedman, 458 F. Supp. 1384 (N.D. Ill. 1978) ............................... 22

United States v. Pirro, 212 F.3d 86 (2d Cir. 2000) ................................................... 20

United States v. Resendiz-Ponce, 549 U.S. 102 (2007) ........................................... 20

United States v. Rittweger, 424 F.3d 171 (2d Cir. 2005) ......................................... 15

United States v. Sims, 808 F. Supp. 607 (N.D. Ill. 1992) ........................................ 17

United States v. Stoecker, 920 F. Supp. 876 (N.D. Ill. 1996) ................................. 16

United States v. Sturdivant, No. 08 CR 00361, 2009 WL 87422
(N.D. Ill. Jan. 13, 2009) ................................................................................................ 15

United States v. Troutman, 546 F. Supp. 2d 610 (N.D. Ill. 2008) ......................... 16

United States v. White, 610 F.3d 956 (7th Cir. 2010) .............................................. 20

United States v. Zheng, No. 15 CR 207, 2016 WL 7116580
(N.D. Ill. Dec. 6, 2016) ................................................................................................. 14

Zafiro v. United States, 506 U.S. 534 (1993) ..................................................... 13, 14

**Statutes**

18 U.S.C. § 1343 .................................................................................................. *passim*

18 U.S.C. § 1956(a)(1)(B)(i) ............................................................................... *passim*

18 U.S.C. § 1956(h) ................................................................................................ 3, 10

18 U.S.C. § 371 ........................................................................................................... 10

42 U.S.C. § 1320a-7b(b) ................................................................................... 10

42 U.S.C. § 1320d-6 ........................................................................................ 10

**Rules**

Fed. R. Crim. P. 7(c)(1) .............................................................................i, 19

Fed. R. Crim. P. 12(b)(3)(B) .................................................................*passim*

Fed. R. Crim. P. 14 ......................................................................................... 13

# INTRODUCTION

Despite the complicated and rambling indictment, and the Government's insistence otherwise, the broad sweeping Covid-19 allegations against Anosh Ahmed (Ahmed) and Mohamed Sirajudeen (Siraj) is not one scheme (as it relates to Sami and Suhaib) but two. Ahmed and Siraj, together, perpetrated the O'Hare Clinic Labs (OCL) Scheme and the Texas Labs Scheme – but that does not make them one scheme in which Sami and Suhaib participated. The Government adamantly insists that the indictment sufficiently pleads Sami and Suhaib's involvement in both the OCL scheme and the Texas Labs Scheme, the distinctions between the two deserve to be repeated.

*OCL Scheme*. The indictment alleges that Ahmed, who had previously been a doctor, COO and CFO at Hospital A (¶1p[2]), stole patient data from Hospital A (¶4) and provided that patient information to Siraj, the owner of OCL (¶¶1s, 8-9, 14) and Chicago Polyclinic (¶1s, 8-9, 19, 38(a-b)). Siraj and Ahmed took the patient data and billed HRSA as if those patients had received a PCR test (¶¶11, 13-15). According to the indictment, these patients did not provide a specimen, and this was nothing more than phantom billing (¶¶15, 17). HRSA paid OCL (Siraj) and Polyclinic (Siraj) which then paid one of Ahmed's entities (¶19): Westside Pharmacy, Global Healthcare (¶¶1q, 8-9, 19, 38a). According to the indictment, Ahmed used individuals who had worked at Hospital A, OCL, and Anosh's other entities to further the OCL scheme to create false email accounts

---

[2] All page and paragraph references are to the Indictment, Dkt. 1.

(¶10), perform data entry (¶11), scramble patient identifiers (¶12), make false or misleading statements (¶16), and obstruct reconciliations (¶18). Sami is not alleged to have done any of these tasks, nor is he alleged to have worked for Hospital A, any of Anosh's entities that participated in the OCL scheme or any of Siraj's entities. The OCL scheme occurred from April 2021 (when the patient information was stolen, (¶4)) and concluded in September 2021 (when HRSA ceased paying OCL (¶¶1r, 20)). This is the OCL Scheme (¶7-20).

*Texas Labs Scheme*. Once HRSA ceased paying OCL in September 2021 (¶¶1r, 20), Ahmed sought to set up other labs (Summer Diagnostic (¶22), Apollo (¶23), SoftLand (¶24), Artemis (¶25) and Helios (¶26)) along with corresponding bank accounts in Texas to continue billing HRSA starting in November 2021 (¶21). The patient data used to bill under these labs is not alleged to have been stolen from Hospital A but rather obtained from individuals purchasing antigen test kits from an internet site (¶¶5(a) & 29(a)(ii)); from door-to-door distribution of antigen test kits (¶¶5(b) & 29(a)(i)); and, from individuals seeking additional information about Covid-19. (¶¶5(c)).

While it is unquestionably easy to miss the distinctions due to the way the indictment was constructed and because the two schemes involve overlapping individuals (Ahmed and Siraj, among others) and overlapping motivations (obtaining federal Covid-19 funds unlawfully), the two schemes and/or the two criminal

agreements[3] as far as Sami and Suhaib are concerned, are not overlapping. Because the indictment cobbles together two similar but separate schemes, prejudice will result if Sami and Suhaib are forced to proceed to trial on allegations and counts that have nothing to do with them – the trial will be unnecessarily extended, the jury instructions will be unnecessarily complicated and the evidentiary prejudicial spillover will be unnecessarily significant. They will not get a fair trial.

The allegations which are not specific to Sami and Suhaib should be severed and the facts associated with the OCL scheme should be stricken. Count 19 should be dismissed as either duplicitous or, based upon the Government's response, insufficiently pled. And, in the alternative, if the Government's response is to be believed and it will present evidence at trial of Sami and Suhaib's involvement in the OCL scheme, it should be required to file a bill of particulars with respect to this allegation, as the indictment is insufficient to put the defendants on notice, the discovery is unusually voluminous, and as far as the defense can glean does not contain facts tying Sami and Suhaib to the OCL scheme.

---

[3] Sami is charged with four wire fraud counts, §1343, (counts 7, 8, 11, 13) and one conspiracy count, §1956(h) (Count 19). The distinction between the wire fraud and conspiracy does not implicate Sami's motions. The indictment fails to allege any concerted scheme to defraud on behalf of Sami earlier than October 2021; and does not allege his knowing agreement and participation in a criminal agreement with respect to the OCL patient data. *United States v. Read*, 658 F.2d 1225 (7th Cir. 1981) (A scheme to defraud and conspiracy embrace analogous, but not identical concepts. Evidentiary rulings for both concepts overlap. Both require knowledge of criminal activity and concerted effort. But a conspiracy requires an agreement, and a scheme does not).

**I.**      **The Indictment Does Not Charge "[A] Single Widespread Scheme" But Rather, Two Schemes – And, Sami Is Not Alleged To Have Been Involved in the Earlier OCL Scheme.**

The Government's response claims the indictment charges "a single, widespread scheme…to submit false claims to [HRSA] for reimbursement of Covid-19 testing of uninsured individuals" that started in April 2021 and concluded in March 2022. (Gov. Br.[4] at 2) The Government's response to the defendants' motions simply restates the issues with the indictment relying on overarching allegations to obfuscate the clear failures of the indictment to plead Sami and Suhaib's knowledge of or participating in the OCL scheme. There is not one single allegation supporting Sami and Suhaib's knowledge of or involvement in the OCL scheme. The paragraphs to which the government points *do not* allege Sami and Suhaib's involvement in or knowledge of the OCL scheme. They are simply introductory paragraphs which merely lump all of the allegations, participants, and labs together but without any indication, as is made clear elsewhere in the indictment, that the OCL scheme ended and then the Texas Lab scheme began:

> It was part of the scheme that AHMED, Sirajudeen, and KHAN, for the purpose of obtaining government funds, caused clinical laboratories, including OCL, Lab A, Summer Diagnostic Labs, Apollo Labs, SoftLand Labs, Artemis Labs, and Helios Labs to prepare and submit false claims to HRSA seeking reimbursement for Covid-19 testing of specimens purportedly collected from uninsured individuals, knowing that such testing had not occurred.

See, *e.g.*, Gov. Br. at 2, *citing* Indictment Par. 2.

---

[4] Dkt. 75.

The indictment, read in its entirety as it must be,[5] alleges an OCL scheme which ended when OCL was shut down and a Texas Lab scheme which began thereafter, and in which Sami is alleged to have participated. To make this point clear and because the Government fails to sufficiently address this issue in its response, the allegations related to the labs and entities at issue, the source of the patient information submitted to HRSA, and the timing of the alleged criminal activity must be reviewed again. A review of these allegations, including a review of the facts alleged in a commonsense manner,[6] spells out the two schemes and clarifies that Sami and Suhaib have not been charged with knowing of or participating in the OCL scheme that occurred earlier in time.

***Labs and Entities at Issue***. The indictment makes clear that Ahmed stole patient data from Hospital A after he was no longer employed there. (¶4, 7-8, 11-12, Count 18) Neither Sami nor Suhaib are alleged to be connected to Hospital A or to be involved in the stealing of patient data from Hospital A. The Government's response does not state otherwise. The indictment does not allege that Sami or Suhaib became aware Ahmed stole patient data from Hospital A not that Sami or Suhaib became aware that this patient data was submitted to HRSA. Neither the indictment nor the Government's response makes reference to any such allegation. The indictment makes clear that Siraj

---

[5] "Indictments are reviewed on a practical basis and in their entirety, rather than 'in a hypertechnical manner.'" *United States v. Smith*, 230 F.3d 300, 305 (7th Cir. 2000).

[6] "The indictment must be read to include facts which are necessarily implied and construed according to common sense." *United States v. Palumbo Bros.*, 145 F.3d 850, 860 (7th Cir. 1998) (internal quotation marks omitted)

ultimately learned that the patient information was stolen, because he owned and operated OCL, which submitted the false billings based on the patient information. (¶¶ 1.s, 4, 7-20) But, again, neither Sami nor Suhaib are alleged to have possessed such knowledge or to be involved in the ownership or operations of OCL. The Government's response does not claim otherwise.

The indictment alleges that once OCL received payment it provided a portion of that payment as a kickback to one of Ahmed's entities: Westside Pharmacy and/or Global Healthcare. (¶1.q; *see also supra* Table A, the OCL Counts (Cts. 1, 2, 3, 4, 5, 6, 16, 17, 18, 20, 21, 22, 23, 21)). Neither Sami nor Suhaib are alleged to have co-owned, operated, been involved with, or even have been aware of the existence of any of these entities. The Government's response does not claim that they were. By comparison, Sami and Suhaib *are* alleged to have been nominal owners or otherwise involved with some of the Texas labs. (¶¶21-27; 38h). The allegations make clear that these ownerships began October 21, 2021 (Summer Diagnostic), November 11, 2021 (Apollo), November 11, 2021 (SoftLand), November 19, 2021 (Artemis), November 19, 2021 (Helios), December 21, 2021 (Tri-State) -- *after* HRSA ceased paying OCL. (¶¶21-37).

The indictment fails to plead with any specificity how or when Sami or Suhaib became aware that unlawful funds from OCL were diverted to any bank accounts related to the Ahmed entities (not by way of executing a wire transfer, being a signatory on the bank accounts, having access to the funds, executing a transfer or any other potential

activity which would minimally support a money laundering allegation associated with these transactions). And, it is not alleged that Sami and/or Suhaib were associated with any of the Ahmed owned bank accounts which received funds related to the OCL scheme (¶¶ 37-38). The Government's response does not state otherwise. Instead it obfuscates the issue by claiming broadly, "…the Indictment… alleges that [Sami] and [Suhaib] had knowledge of and/or a role in the wire fraud scheme beginning with OCL… and charges [Sami] with causing the transmission of specific wire communications in interstate commerce for the purpose of executing the scheme." (Gov. Br. at 7) But, the Government's response does not point to any specific allegation in the indictment that connects Khan to a wire transfer related to OCL and/or Ahmed entities – because there is no such allegation.[7] By comparison, the indictment *does* specifically allege a connection to some of the Texas Labs bank accounts and associated wire transfers. (¶¶ 38h, Counts 7, 8, 11, 13)

In short, Sami and Suhaib are not alleged to have been involved with Hospital A (*c.f.* ¶¶1.o-p, t, w, aa; 7-20); connected to OCL, or connected to any of the Ahmed entities, or bank accounts that received the kickbacks from OCL (¶¶ 1q., 8, 38a-g; and Counts 1, 2, 3, 4, 5, 6, 16, 17, 18, 20, 21, 22, 23, 21). There are no such allegations, because Sami and Suhaib did not have knowledge of or participation in the OCL scheme.

---

[7] As noted above, the government points only to the indictment's introductory paragraphs rather than reading the indictment in its entirety.

*Source of "patient identifiers" vs. "individual" identifiers.* Another clear line of demarcation between the OCL scheme and the Texas Labs scheme is the source of the data used to bill HRSA. The indictment alleges that Ahmed obtained **patient** data from Hospital A in April 2021 and utilized that patient data to bill HRSA through OCL beginning in June 2021 until HRSA ceased paying OCL in September 2021. (¶¶4, 7-20) As the defendants pointed out in their opening briefs, the indictment does not allege that Sami and Suhaib knew of this or had a role in it. The indictment and the Government's response make the broad accusation that, "It was further part of the scheme that, using collection patient identifiers, AHMED, KHAN, Chaudry and others cause fraudulent claims… to be submitted to HRS from OCL, Lab A, and… Non-Operational Texas Labs." (¶6) But, the Government's response does not point to any specific allegation against Sami and Suhaib related to their involvement in or knowledge of the theft of patient data from Hospital A, the billing to HRSA from OCL, or the kickbacks received thereafter. The broad statement can be read to include only Sami and Suhaib's involvement with the Texas Labs, without any involvement to the OCL "patient" data. This becomes clear when comparing the specific allegations related to Sami and Suhaib and the Texas Labs activity.

The indictment **does** specifically allege that Sami and Suhaib obtained "personal" identifiers (but not patient data) from (i) individuals ordering at home test kits from the internet (¶5a); (ii) individuals who received a free antigen test (¶5b); and, (iii) individuals

who sought information about COVID-19 (¶5c) ("personal identifiers"). Later in the indictment, when specifically discussing the allegations related to the Texas Labs, the indictment claims that Sami submitted false claims to HRSA based upon "identifiers" collected through (i) door-to-door and other public distribution of Covid-19 antigen tests and from individuals purchasing antigen tests from an internet site. (¶20a ("identifiers"); *c.f.* ¶¶4, 10-15, 17 ("patient identifiers")). It says nothing of "patient" identifiers or patient data obtained from Hospital A, that allegation is reserved for Ahmed alone. (¶4)

The lack of specificity with respect to the Government's claim that Sami and Suhaib had knowledge of stolen patient data and its submission to HRSA is a gaping and important hole. It demonstrates that there are two distinct schemes and Sami and Suhaib did not have knowledge of or participation in the OCL scheme.

*__Timing of the allegations__*. Putting Count 19 aside (which has separate but related problems addressed in defendants' motions), when structuring the charges in the indictment chronologically, the distinction between the OCL criminal activity and the Texas Labs criminal activity is crystal clear. The OCL counts range from April 2021 (when the patient identifiers were stolen) to September 2021 (when HRSA ceased paying OCL). None of those charges (tied to wirings on specific dates) include Sami or Suhaib. The counts that first charge Sami do not start until November 2021, after the Texas Labs are alleged to have been formed and these charges only involve Texas Labs and bank accounts associated with the Texas Labs. The chart below clearly establishes this reality.

| Ct./Date | Δ | Lab | Allegation |
|---|---|---|---|
| **OCL Scheme -- April 2021 – September 2021** | | | |
| **4/14/2021** **Ct. 18** | Ahmed | Hospital A | §1320d-6(a)92) and (b)(3) [wrongful disclosure of patient information] Theft of Hospital A patient data. |
| **6/2021-** **9/2021** **Ct. 15** | Ahmed | Hospital A WSP OCL | §371 conspiracy [objects: kickback §1320(a)-7b(b)(1)(B) & (b)(2)(B)] |
| **7/13/21** **Ct. 16** | Ahmed | GHC OCL | §1320a-7b(b)(1)(B) [health care kickbacks]. $1,250,000 from OCL to Global Healthcare (Anosh owned). |
| **8/2021 to** **1/2023** **Ct. 19** | Ahmed Khan Chaudry | All Labs | §1956(h) [money laundering – fraud and kickbacks] Ahmed, Khan, and Chaudry conspired with each other and others to conduct financial transactions resulting in wire fraud and violations of the Anti-Kickback Statute. |
| **8/8/2021** **Ct. 1** | Ahmed | OCL | §1343 [scheme to defraud] Claim CW29380244 from OCL to HRSA for a payment of $164.84 |
| **8/12/2021** **Ct. 20** | Ahmed | WSP | §1956(a)(1)(B)(i) [kickback] Transfer of $4.1M from Westside Pharmacy at Bank B to Gold Oak Capital at Bank B, which funds represented HRSA proceeds paid for false claims of testing submitted through OCL. |
| **8/18/2021** **Ct. 2** | Ahmed | OCL | §1343 [scheme to defraud] Claim CW29380244 from OCL to HRSA for a payment of $123.46, |
| **8/18/21** **Ct. 3** | Ahmed | WSP | §1343 [scheme to defraud] Transfer of $500K from Chicago Polyclinic LLC at Bank E to Westside Pharmacy Bank B, which funds represented HRSA proceeds paid for false claims of testing submitted through OCL. |
| **8/20/2021** **Ct. 17** | Ahmed | OCL | §1320a-7b(b)(1)(b) [health care kickback] Siraj, as OCL, paid Ahmed $750K. |
| **8/30/2021** **Ct. 4** | Ahmed | OCL | §1343 [scheme to defraud] Claim CW9512498 from OCL to HRSA for a payment of $183.51 |
| **9/3/2021** **Ct. 21** | Ahmed | WSP | §1956(a)(1)(B)(i) [money laundering - kickbacks] Transfer of $1.5M from Westside Pharmacy at Bank B to Westside Pharmacy at Bank B. |
| **9/3/2021** **Ct. 22** | Ahemd | WSP | §1956(a)(1)(B)(i) [money laundering - kickbacks] Transfer of $1.7M from Westside Pharmacy to Westside Pharmacy. |
| **9/3/21** **Ct. 23** | Siraj | OCL | §1956(a)(1)(B)(i) [money laundering - kickbacks] Transfer of $675K from OCL at Bank A to B2B Global USA at Bank G. |
| **9/8/2021** | Ahmed | WSP | §1956(a)(1)(B)(i) [money laundering - kickbacks] |

| Ct./Date | Δ | Lab | Allegation |
|---|---|---|---|
| Ct. 24 | | | Transfer of $1.8M from Westside Pharmacy |
| 9/17/2021 Ct. 5 | Ahmed | WSP | §1343 [scheme to defraud] Wire of $950K from Chicago Polyclinic LLC which funds represented HRSA proceeds paid for false claims of testing submitted through OCL. |
| 9/24/2021 Ct. 6 | Ahmed | OCL | §1343 [scheme to defraud] A wire transmission of $875K from Chicago Polyclinic LLC at Bank E to Westside Pharmacy at Bank B, which funds represented HRSA proceeds paid for false claims of testing submitted through OCL. |
| Texas Labs Scheme -- November 2021 – May 2022 | | | |
| 11/18/2021 Ct. 7 | Ahmed & Khan | Summer Diagnostic [Tx Lab] | §1343 [scheme to defraud] A wire transmission generated by submission of claim DA83796198 from OCL to HRSA for a payment of $164.84, representing a false claim submitted by Summer Diagnostic for a Covid test of a sample claimed to be submitted by Individual T.D. |
| 12/20/2021 Ct. 8 | Ahmed & Khan | Summer Diagnostic [Tx Lab] | §1343 [scheme to defraud] A wire transmission of $2,893,271 from Bank F to Bank A, which funds represented HRSA proceeds paid for false claims of Covid testing submitted by Summer Diagnostics. |
| 3/21/2022 Ct. 9 | Ahmed | Lab A [Tx Lab] | Count 9 – §1343 [scheme to defraud] A wire transmission generated by submission of claim DG38994436 from a claims processor for HRSA for $164.84, representing false claim of Covid testing submitted through Tristate. |
| 3/22/2022 Ct. 10 | Ahmed | Lab A [Tx Lab] | Count 10 - §1343 [scheme to defraud] A wire transmission generated by submission of claim DG38994436 from a claims processer for HRSA to Bank F for payment in the amount of $164.84, processed through servers located in different states, representing a false claims of Covid-19 testing submitted through Lab A. |
| 3/23/2022 Ct. 11 | Ahmed & Khan | Apollo [Tx Lab] | Count 11 – §1343 [scheme to defraud] A wire transmission generated by submission of claim DG51167118 for payment of $158.83, representing a false claim submitted by Apollo Labs for Covid testing of a sample claimed to be taken from Z.S. |
| 3/24/2022 Ct. 12 | Ahmed | SoftLand [Tx Lab] | Count 12 – §1343 [scheme to defraud] A wire transmission generated by submission of clam DG57052251 for payment of $158.53, representing a false claim submitted by SoftLand Labs for testing of a sample claimed to be taken from N.S. |
| 5/5/2022 Ct. 13 | Ahmed & Khan | Apollo [Tx Lab] | Count 13 – §1343 [scheme to defraud] A wire transmission of $2,263,168 from Bank F to Bank A, representing HRSA proceeds paid for false claims of testing submitted by Apollo Labs. |

| Ct./Date | Δ | Lab | Allegation |
|---|---|---|---|
|  |  |  |  |
| 5/5/2022 Ct. 14 | Ahmed | SoftLand [Tx Lab] | Count 14 – §1343 [scheme to defraud] A wire transmission of $3,251,250 from Bank F to Bank A account x6385, representing HRSA proceeds paid for false claims of testing submitted by SoftLand Labs. |

In sum, as alleged, Ahmed and Siraj used patient data Ahmed stole from Hospital A to submit phantom bills to HRSA through OCL for which Ahmed received a kickback. Once that criminal scheme ended, because HRSA barred OCL, Ahmed (and Siraj) started a separate scheme by setting up and using Texas labs to submit bills to HRSA, which Sami is alleged to have joined, specifically through acting as a nominal owner of non-operations Texas labs collecting patient data from distributing antigen tests and Covid-19 door-to-door and through the internet, causing false bills to be submitted on behalf of Apollo and Summer Diagnostics and making wire transfers of money received from HRSA. The Texas Labs scheme needs no further clarification. The indictment's direct, specific, and sufficient allegations against Sami related to the Texas Labs scheme, however, stand in stark contrast to the allegations regarding Sami in the OCL scheme.

The OCL scheme may be properly joined due to Ahmed and Siraj's overarching criminal agreement, and the defense did not make a misjoinder claim. The OCL allegation and evidence (and defendants if necessary) should nevertheless be severed (as argued in the defendants' opening briefs) because it would be unfairly prejudicial to force Sami and Chaudry to defend against the OCL scheme (in which they had no

participation or knowledge), particularly when neither Ahmed or Siraj will not be at trial. Fed. R. Crim P. 14 ("If the joinder of offenses or defendants in an indictment...appears to prejudice a defendant... the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that just requires.")

The OCL scheme is the bulk of the charges (16 of 24 counts), spans many months (April 2021 through September 2021), involves numerous individuals that are not alleged to have participated in the Texas Labs scheme (*see*, ¶¶7-20), and includes complicated and intricate financial data of multiple bank accounts and transactions. They also involve complex allegations not alleged related to the Texas Lab Scheme – violations of the ant-kickback statute, with complex defenses potentially available. The defendants' have clearly established the following prejudices which would result if forced to trial on the OCL scheme: there is a gross disparity of evidence, such evidence would not be admitted against Sami and Suhaib alone (R. 70, p.11-14; R. 63, pp. 9-11); the wrongdoing of Ahmed and Siraj would overwhelm and confuse the jury so that Sami and Suhaib risk a "transference of guilt" and their defenses risk being drowned out (*Id*.); Sami and Suhaib are minimal actors in vast and wide reaching criminal activity (*Id.*); and, the jury instructions would be unnecessarily complicated and confusing when considering money laundering and kickback schemes for which Sami and Suhaib are not involved (*Id.*). *See id*, p. 14, *citing Zafiro v. United States*, 506 U.S. 534,

539 (1993) (listing these very reasons as a basis to establish prejudice and justify severance).

The Government's response did not resolve this issue by either substantiating the claim that Sami and Suhaib were involved in the OCL scheme, or by suggesting that judicial economy would be better served than any prejudice which may result[8]. *Zafiro*, 506 at 539 (Minimal players often risk prejudice which should be balanced against judicial economy). But, in this case, prejudice is the only consideration because the other defendants are not even present for trial. *c.f. United States v. Zheng*, 2016 WL 7116580 at *2 (N.D. Ill. 2016)(Dow, J.) (judicial economy outweighed potential prejudice); *see also United States v. Coleman*, 22 F.3d 126, 134 (7th Cir. 1994) (courts "should not hesitate to order severance…if the risk of real prejudice grows too large to justify whatever efficiencies a joint trial does provide.")

Of the fifty plus cases cited by the Government, not one of them involved a case where the co-defendant was not present for trial.

Moreover, the Government's reliance on Seventh Circuit cases fails to recognize that the appellate court reviews a case in hindsight to determine whether the district court's denial of a motion to sever counts or defendants resulted in prejudice to the appellant. Here, the Court is looking prospectively, not retroactively, to protect against

---

[8] The Government spent a significant time addressing the propriety of joinder in this case, an issue the defendants did not raise or argue. (Gov. Br., pp. 6-9)

prejudice, not assess whether it occurred. The District Court has a far weightier and more difficult task, in that it seeks to ensure efficiencies of the system but also cares about the *risk* of prejudice – not whether prejudice actually occurred or in other words, whether the error of a failure to sever was ultimately harmless. For example, in *United States v. Rittweger*, 424 F.3d 171, 179-180 (2nd Cir. 2008), the Second Circuit found denial of severance harmless where the Government tried two disparate conspiracies together because of overlapping participants and similar goals.  But, the Court admonished the Government for trying the cases together, stating

> …we question the government's decision to try the two conspiracies together. As the government conceded at trial, [one defendant] had no knowledge of or participation in the First Scheme and [the other defendant] had no knowledge of or participation in the Second Scheme. Given that evidence relating to the First Scheme is not strictly necessary to understanding the intent of the Second Scheme, the district court's conclusion that "evidence of both conspiracies and both sets of charges would be admissible as background evidence," would be highly questionable if [the two defendants] had been tried separately. Further, the government's admittedly "imprecise" lumping together of the conspirators during its rebuttal summation reflects the danger of joining relatively minor participates, who have discrete roles in a larger conspiracy, with the more prominent and active members of overlapping conspiracies. [The joinder rules] do[] not provide the government with limitless discretion to join defendants and does not absolve the government from an independent obligation to consider the unfairness that may result from joinder.

*Id*. at 179-180.

Similar frustrations were raised in *United States v. Sturdivant,* 2009 WL 87422 (N.D. Ill. Jan. 13, 2009) (Kennelly, J.) which resulted in a mistrial due to the Court's reliance on the Government's representations that it would "link" up two disparate fraud schemes,

where one defendant did not participate in the earlier scheme. There, the Government charged two defendants with an overarching fraud scheme, in which one defendant was only involved in the early fraudulent transactions and the second defendant was involved in the later transactions. The first defendant pled guilty and when the second defendant went to trial, she moved to exclude the earlier evidence because she was not involved in the earlier transactions. The Government reported that they would link up her earlier involvement at trial. That never materialized; the Court was forced to declare a mistrial because the jury heard volumes of evidence unconnected to the second defendant—significantly prejudicing that defendant. The importance of considering potential injustices where joinder is perhaps technically proper comes on the front end, with the district court, not on the back end on appeal. The determination of prejudice is a prospective assessment involving an assessment of the risk of prejudice while being confident of a fair trial and a fair determination of the issues. The indictment in this case, and the Government's subsequent response does not provide the needed confidence.

The defendants cited other district court cases which struck this balance on the front end. R. 70, p. 10 *citing, United States v. Stoecker*, 920 F.Supp. 876, 884-86 (N.D. Ill. 1996) (Gettleman, J.) (granting severance due to spillover prejudice and guilt transference) *United States v. Troutman*, 546 F.Supp.2d 610 (N.D. Ill. 2008) (Castillo, J.) (granting severance based upon gross disparity of the evidence). And, the Government

cites only one district court case which is easily distinguishable because that case involved a full docket of defendants, present and ready for trial – that is not so here. (Gov. Br. at 8, *citing United States v. Sims*, 808 F.Supp. 607, 617 (N.D. Ill. 1992) (Alesia, J.))

The Government's only real substantive response to the problems raised by the defendants is to suggest limiting jury instructions, instructing the jury to consider the defendants and counts separately. (Gov. Br. at 11-12) But, this is a woefully inadequate, and an unnecessarily complicated solution when severance is the far more logical, simpler and fairer solution. A grant of the defendants' request would result in severing counts related only to OCL (Counts 1, 2, 3, 4, 5, 6, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24) and striking any reference to the OCL scheme. Should Ahmed ever return for trial, he can be tried on these counts separately, and the redundant and narrower Texas Labs counts would require little overlap. For these reasons, defendants' motion to sever and/or preclude evidence should be granted.

## II. Count 19 Is Either Duplicitous or Insufficiently Pled – Either Way, It Should be Dismissed.

Count 19 is duplicitous because it joins two offenses—a conspiracy to launder money from the OCL scheme and the Texas Labs scheme—in the same count. R. 70, p. 16, *citing* Fed. R. Crim. P. Rule 12(b)(3)(B). Two offenses joined together in one count undercuts the defendants right to a unanimous verdict (*Id.* at 16); undercuts the defendant's Fifth and Sixth Amendment right to notice and against double jeopardy

(*Id.*); risks prejudicial evidentiary rulings (*Id.* at 17); and could impact sentencing consideration, as to what facts a jury found against a particular defendant for purposes of sentencing (*Id.*). For these reasons, two charges cannot be joined in a single count and when it happens, dismissal is the remedy. Fed. R. Crim. P. Rule 12(b)(3)(B)(i). Count 19 joints two conspiracies, a conspiracy to launder money from the OCL scheme which generated money from wire fraud and anti-kickback violations, a conspiracy to launder money from the Texas Labs scheme, which generated different money via wire fraud and did not involve anti-kickback violations. This is duplicity and for the reasons stated, it must be dismissed.

The Government responds to defendants concerns regarding Count 19 by claiming it charged Sami and Suhaib with joining a conspiracy to commit money laundering, engage in kickbacks and wire fraud beginning in August 2021 that includes both the OCL activity and the Texas Labs activity. (Gov. Br. p. 19; Ind. p. 40, referencing the factual allegations relative to both the OCL scheme and the Texas Labs scheme, and the relative kickback allegations (¶¶1-38 from Count 1-14, and ¶¶1-9 of Count 15). Specifically, the Government indicates that the two conspiracies were "a single continuing course of conduct" and that the "goal of the conspiracy alleged in Count Nineteen was to launder the proceeds of illegal activity…" (Gov. Br. p. 19)  But, as explained above, Sami and Siraj were not referenced in any of the OCL activity and the indictment provides no allegation as to their knowledge of or participated in the OCL

18

activity other than two broad introductory allegations which are not consistent with a common sense reading of the indictment in its entirety.[9]

Regardless, the Government argues that Sami and Suhaib joined the conspiracy at the beginning, even if they did not know all the goals and objects of the conspiracy. (Gov. Br. p. 22) But, here, the criminal activity alleged is not occurring simultaneously and does not overlap. The criminal activity alleged is temporally disparate (as explained above). So, to the extent that the Government is arguing Sami and Suhaib knowingly joined and participated in an overarching conspiracy at the beginning, the goal of which could only have been to launder money generated by wire fraud and anti-kickback violations starting with the OCL scheme, the indictment fails to sufficiently state that offense, and Count 19 must be dismissed on that basis. Federal R. Crim. Proc. Rules 7(c)(1) & 12(b)(3)(B)(iii) & (iv).

An indictment must be dismissed if it fails to state an offense because insufficiently pled indictments fail to put the defendant on notice of the charges against

---

[9] "It was part of the scheme that AHMED, Sirajudeen, and KHAN, for the purpose of obtaining government funds, caused clinical laboratories, including OCL, Lab A, Summer Diagnostic, Apollo Labs, SoftLand Labs, Artemis Labs, and Helios Labs to prepare and submit false claims to HRSA seeking reimbursement for Covid-19 testing of specimen purportedly collected from uninsured individuals, know that such testing had not occurred." Ind. p. 11, ¶3.

and

"It was further part of the scheme that, using collected patient identifiers, AHMED, KHAN, Chaudry and others caused fraudulent claims for Covid-19 testing to be submitted to HRSA from OCL, Lab A, and Ahmed's Non-Operational Texas Labs." Ind., p. 12, ¶6.

But, the indictment does not say more than this as to Sami and Suhaib's supposed knowledge of and participation in the OCL Scheme.

him and fail to confirm the grand jury's consideration of the charges. Fed. R. Crim. P. 12(b)(3)(B)(iii) & (iv); *Hamling v. United States,* 418 U.S. 87, 117 (1974); *United States v. White,* 610 F.3d 956, 958 (7th Cir. 2010). While tracking the statutory language may be sufficient, where the indictment fails to set forth the essential elements of the offense, the indictment must charge crimes with "greater specificity" in order to "provide fair notice to defendants and to ensure that any conviction would arise out of the theory of guilty presented to the grand jury." *See United States v. Resendiz-Ponce,* 549 U.S. 102, 109-110 (2007). Here, the Government has pled no facts to establish that Sami and Suhaib had knowledge of or participated in the OCL scheme, and so they could not have conspired with anyone to launder money generated from that scheme.

The Fifth Amendment "requires that an indictment contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury." *United States v. Pirro,* 212 F.3d 86, 92 (2nd Cir. 2000) ("Undoubtedly, the language of the statute may be used in the general description of the offense, but it must be accompanied with such a statement of the facts and circumstances as well inform the accused of the specific offense, coming under the general description with which he is charged.") Count 19 here, as established above, fails to convey any facts upon which the grand jury relied when it determined that Sami and Suhaib joined the conspiracy charged in Count 19 related to the OCL scheme, fails to allege any facts suggesting they participated in or were aware of an

antikickback scheme, and fails to allege any facts supporting their knowledge of money laundering related to the OCL scheme. The Government's response also does not point to any such allegation which accounts for this gap. Instead, the Government suggests that when and how Sami and Suhaib joined the OCL scheme is a matter for the jury to consider.

The Government retorts, "Here, it is up to the jury to decide when defendants entered and/or learned of the scheme and conspiracy, and what their roles were. It is also up to the jury to decide whether [Sami and Suhaib] knowingly laundered the proceeds of unlawful activity." (Gov. Br. at 8) The Government frustratingly and entirely misses the defendants' concerns and the point of the criminal justice process. The fairness of the criminal justice process is based upon a defendant's charges being considered by the grand jury and a defendant's right to notice of the law he broke and how. Defendants are not supposed to wait until the close of the Government's case to learn when the grand jury thought they learned of the scheme and conspiracy and what their roles were, or when they became aware money was the proceeds of unlawful activity. This is not a request for the Government to reveal trial strategy, it is a request to understand what charges it is that the defendants are defending against, and to ensure the grand jury considered those charges; to protect against double jeopardy; and to ensure a fair trial. For the reasons stated, Count 19 is either duplicitous or insufficient – either way, it must be dismissed.

**III.    In the Alternative, A Bill of Particulars is Required to Appropriately Advise Defendants of the Charges Against Them With Respect to the OCL Scheme and the Count 19 Money Laundering Allegations.**

If the Government's claim is that Sami and Suhaib knew of and participated in the OCL criminal activity and the associated money laundering transactions and it sufficiently pled the same, then it should be simple for the Government to issue a bill of particulars listing the financial transactions that are charged as part of Count Nineteen. This list will make clear when Sami and Suhaib allegedly joined the conspiracy charged in Count 19. (R. 70 at 21) The defense anticipates that such disclosures will make abundantly clear that neither Sami not Suhaib had any connection to financial transactions related to OCL and any funds generated by anti-kickback violations. Such disclosure is also necessary for the defendants to prepare their defense and avoid prejudicial surprise. *United States v. Hedman*, 458 F.Supp. 1384, 1385 (N.D. Ill. 1978).

Instead, the Government responds to this request by stating, "[it] has produced the banking records that show the transactions that constitute money laundering, and defendants do not claim otherwise" and "Defendants admit that the Government produced the banking records that contain the money laundering transactions. That is sufficient." (Gov. Br. at 24) This is true. The Government has provided significant discovery and has produced the bank records. But, the Government again misses the point. By the Government's own admission, the discovery in this case is voluminous, as explained in the defendants' opening brief, more than 1 million pages. (R. 70 at 24). In

the discovery provided, there are hundreds of thousands of financial transactions from seven banks and fifteen accounts, connected to more than eight different entities. The indictment is so deficient, that the defense does not have even one fact, one date, one occurrence, one transaction, or one communication from which to begin searching the discovery for the elusive claim that Sami and Suhaib were even aware of the OCL scheme; much less any clue which transactions support a conspiracy to commit money laundering on behalf of the OCL scheme, as described in Count 19. Simply put, it is an impossible feat for the defense to identify all of the financial transactions related to Count 19. The grand jury must have considered some transactions, yet the government is unwilling to disclose even those.

The Government misstates the defendants' position with respect to the charges, when it states, "Defendants do not claim that the indictment itself lacks sufficient specificity as to the criminal charges…" (Gov. Br. at 24). The defendants argued that the OCL charges were so deficient that they should be severed because the defendants' were not involved.

Lastly, the Government argues against providing a bill of particulars claiming that "defendants have knowledge of the bank accounts they opened, that bore their own names and from which they transferred money to Ahmed". (Gov. Br. at 24-25). That argument is contrary to what is actually charged in Count 19. If Count 19 charged that Sami committed money laundering, then perhaps the financial transactions at issue

23

could be located. But, Count 19 charges a conspiracy. It is not just the individual defendant's associated bank records (and voluminous transactions therein) which could serve as the basis for the money laundering conspiracy. There are many bank accounts that the defendants are not connected to: Ahmed bank accounts, OCL bank accounts, Siraj bank accounts and others that are at play. This is exactly the problem. The Government's response reveals the need for a bill of particulars. Defendants may have knowledge of their own accounts, but where are they supposed to gain knowledge of the other defendants' accounts? One is a cooperator (Siraj) and the other a fugitive (Ahmed). A bill of particulars is necessary and appropriate.

**IV.     Defendant Sami Khan Joins Co-Defendant Suhaib Chaudry's Response to His *Brady* Motion.**

**V.     Conclusion**

In light of the above, Defendant Mahmood Sami Khan respectfully request that the Court grant: (1) his motion for severance of counts and to preclude evidence related to the OLC activity; (2) his motion to dismiss Count 19 as duplicitous, or for its failure to state an offense, or, in the alternative, to preclude from that count evidence related to OCL and anti-kickback violations; and, or in the alternative (3) for a bill of particulars related to the financial transactions at issues in Count 19 and any allegations of when or how Sami knowingly joined the OCL Scheme.

DATED: February 12, 2026

s/Patrick Blegen

Patrick Blegen
BLEGEN & ASSOCIATES
53 West Jackson Blvd., Suite 1424
Chicago, IL 60604
Telephone: (312) 957-0100
pblegen@blegengarvey.com

s/Gabrielle R. Sansonetti

Gabrielle R. Sansonetti
LEINENWEBER, DAFFADA, & SANSONETTI
120 N. LaSalle Street, Suite 2000
Chicago, Illinois 60602
(773)716-6117
gabrielle@ilesq.com